I will call NAACP v. East Ramapo Central School District. Are those attorneys ready to argue? Yes, Your Honor. And is the opposing counsel ready to argue as well? Mr. Dameron? Is he one of the participants? Yes, Mr. Dameron is present. Mr. Dameron, you have to unmute yourself. Okay. All right. Then, Mr. Edwards, you can stand down for a few minutes, and we will hear from the plaintiffs in NAACP v. East Ramapo. Counsel, you may proceed. Good morning, and may it please the court. I'm Randall Levine for the appellant and the defendant, the East Ramapo Central School District. This is a vote dilution case in which the district court invalidated the practice of at-large voting required by state law. That decision rests on fundamental legal errors. First, the district court held that it was not required to find that race was a cause of election results to find a violation of Section 2. Instead, it treated causation as an unimportant factor in the totality of the circumstances. Isn't that what Goosby stands for? That we don't need to find that race is a factor? No, Goosby does not stand for that proposition. Goosby stands for the proposition that causation, the reason why voters vote the way they vote, is not to be considered in the third jingles precondition, but it is still... What Goosby says is that while racial causation is relevant, it's just one of many factors to be considered. Goosby does not say that it's just one of many factors to be considered, and in fact, this is an important distinction. The purpose of the totality of the circumstances factors is to get to the question of causation, to determine whether minorities are being excluded on account of race, or because they're being excluded on account of something else that Section 2 does not regulate. And the Goosby case is actually quite a good example, because it presented the court with the choice of, are partisan politics motivating voters in this jurisdiction, or is it race? And the court concluded that it was race and not partisan politics, because there was an exclusive slating process. Isn't it sufficient if there's an impact based on race? In other words, even assuming the intent is not because of race, but that there is an impact on the basis of race, isn't that sufficient? No, it's not sufficient. In fact, the Supreme Court in DeGrande expressly rejected that proposition. The three jingles preconditions go to that question of whether there is a correlation between the race of voters and the way voters vote. But the Supreme Court said that those three preconditions by themselves are not sufficient. The purpose of the factors is to get to that key inquiry of whether minorities are excluded on account of race. That's a but-for causation requirement, just under the plain language of the statute. And every single court of appeal that has ever considered the question, including this court, has found that there is a causation requirement, that race actually has to play a causal role in the way elections turn out. Isn't there legislative history that says that Congress used the words on account of race or color in the act to mean with respect to race or color, with respect to race or color, and not to imply any required purpose of racial discrimination? That's right out of the Senate report. Legislative history is only helpful in construing ambiguous statutory terms. There's nothing ambiguous about on account of race. What do you mean? We just heard an ambiguity that the Senate thought they had to address. That's ridiculous. I'm sorry. I don't believe it's ridiculous. The Supreme Court, in the Bostock case, just recently provided a very detailed plain language interpretation of the phrase on account of and found that it was synonymous with because of or based on, and it connotes but-for causation. In the statute, Congress retained the language on account of race. One of the things, just to change the subject a little bit, one of the things I find striking about Judge Seibel's opinion is her detailed credibility findings. I mean, she really did not believe these witnesses. She found that they were lying. I think she calls one of them the worst witness she's ever seen, and she's been around for quite a while. What do we do with these credibility findings and the many days of trial and the deference we're supposed to give to the trial judge? I mean, do those findings not matter? Well, the credibility findings don't save the court from reversal because they don't cleanse the legal errors that infect the opinion. Whatever the court may have thought about the credibility of witnesses, it doesn't change the fact that the court was required to find racial causation to find a violation of Section 2, and the court expressly did not find it. It said that there is no evidence that racial animus is motivating voters, and it doesn't cleanse the court's legal errors in its misapplication of the Senate factors, and it doesn't cleanse the court's legal error in simply ignoring the fact that in this school district, there is a long history of minorities consistently being slated on both sides of the political divide in the district, minorities consistently being elected. Those two facts by themselves are undisputed. The trial court also considered the reasons for that and found, made findings of fact that those minority candidates who did make it were in uncontested elections, were considered to be friendly to the folks in control. I mean, those are factual findings. Aren't we bound by those findings? Well, those factual findings don't get to the problem that there was a legal error infecting the court's analysis. What the court did was it misapplied a legal doctrine, the safe candidate doctrine, to find that it could just ignore the election of every single minority candidate that has ever been elected to the school board. But that's not what the safe candidate doctrine is for. The safe candidate doctrine allows courts to disregard or discount aberrational minority victories. But there's nothing aberrational about minorities winning elections in East Aramco. They win all the time. Misapplication of a legal doctrine is a legal error, not a factual error. And whatever factual determinations the court made based upon that misunderstanding of the legal standard that's to be applied are reversible under a clear error or a de novo review. It doesn't matter what the standard of review is. Misapplication of the law is reversible. And the court did misapply the law here. The court misapplied the law on the safe candidate doctrine as described. The court completely misapplied the law on the Senate factor analysis, particularly factor seven is a good example. So if we disagree with you that the court misapplied the law, you lose? No. This case is reversible under any standard of review because there is also, if it's clear error. Under any standard of review, the case is reversible? Yeah, absolutely. Yes, because there is clear error here as well. It was clear error for the court to find, for example, that minorities are excluded from the slating process when the undisputed evidence was that minorities are slated on both the private school community slate and the public school community slate all the time. There is no exclusion of minorities from the political process here. The district court found that the slating process was not open to all minorities. Isn't that true? Well, there's a legal error embedded in there and there's a factual error embedded in there. The legal error is that the factor is asking the court to consider whether minorities have been excluded. Members of the minority group have been excluded from the slating process. It is legally and factually erroneous to conclude that a slating process that produces minority candidates every year somehow excludes minorities or isn't open to minorities. But they weren't minority preferred candidates. They were whereby us for a preferred candidates. I'll just go over my time to answer that question. For purposes of factor four, it doesn't matter if they're minority preferred candidates. What matters is that they're members of the minority group and replacing minority preferred candidates with members of the minority group is a legal error. It is a major change that changes the factors meaning. If members of the minority group have access to the slating process, that shows that minorities are not excluded on account of race. If minority preferred candidates who may be of any race are excluded from the slating process, that's because of politics. And section two does not preclude that sort of activity. That's just regular democracy in action. All right, counsel. You have reserved two minutes for rebuttal. We'll hear from counsel for the plaintiff petitioners. Counsel. Good morning, Your Honor, and may it please the court. Charlie Dameron of Latham and Watkins appearing for plaintiff's appellees. I'd like to touch on a crucial point that Mr. Levine was discussing just a few minutes ago, which is, you know, he says that we need to prove abridgment of the right to vote on account of race or color under subsection A of the statute. He says that imports a but for causation test. I suggest that that argument is complete distraction. All of the action in this case is at subsection B of the statute. And in subsection B, Congress set out a distinct causation test for proving a violation of subsection A, an abridgment of the right to vote on account of race or color. Under that test, a plaintiff can prove his section to claim by showing that under the totality of the circumstances, minority voters have been deprived of an equal opportunity to participate in the political process and to elect representatives of their choice. The district has completely neglected the text of subsection B because that text defeats the district's argument about racial animus. Subsection B says nothing about racial animus. It merely requires plaintiffs to prove that and shut out of the political process and deprived of the opportunity to elect representatives of their choice. That's by design. Subsection B is a results test. It was adopted by Congress precisely for the purpose of overruling the Supreme Court's decision at City of Mobile against Bolden, which required section 2 plaintiffs to prove their case through evidence of intentional discrimination. Congress rejected that requirement and subsection B embodies Congress's determination that section 2 plaintiffs should be able to prove their case through objective indicia of exclusion from the political process. The district's argument is not only inconsistent with the text of section 2, it also runs afoul of this court's binding case law. As your honors pointed out, the Goosby case squarely rejected the argument that the district has raised here. I'd urge this court to review the briefing in Goosby because the district's brief in this case looks a lot like the defendant's brief in Goosby. In Goosby, both the district court and this court rejected the notion, and quoting from this court's Goosby decision, they rejected the notion that, quote, plaintiffs must establish that racial bias infected the voting community. That's at 180 F3rd at 483. So Goosby clearly stands for the proposition that a section 2 plaintiff may not affirmatively prove racial animus on the part of voters. No other court has ever assigned to plaintiffs the burden of proving that voters are driven by racial animus. To be sure, many courts, including this court, have properly recognized that voters' motivations are relevant under the totality of the circumstances, but it's not part of the plaintiff's burden. It's the defendant's burden to bring forth evidence of a race-neutral explanation for racially polarized voting. District court then assesses that explanation under the totality of the circumstances, and that is exactly what the district court did here. And so, counsel, can I ask you a question relating to Mr. Levine's last point? Does it make a difference in our analysis if the minority people who do get elected were not minority preferred? Does that make a difference? Your Honor. If it does, why? It certainly does, and I direct this court to the text of subsection B. The ultimate inquiry in this case is whether minority voters, members of the electorate, are able to participate effectively in the political process and to elect representatives of their choice. Now, it's certainly true that under Senate Factor 7, we look to the race of the candidates who win election. But as Your Honors have already pointed out, the district court engaged in extensive fact-finding regarding the election of minority candidates in this particular community and applied a well-established doctrine, the safe candidate doctrine, the special circumstances doctrine, to find that the election of those candidates was not evidence that minority voters have an equal say in the political process, an equal opportunity to participate in the political process and to elect representatives of their choice. I would focus this court's attention just on the minority candidates, the minority representatives who currently serve on the board and the circumstances under which they've been elected to the board. So one minority candidate who was elected to the board and is currently serving is Sabrina Charles-Pierre. She was originally appointed only as the result, the district court found, at S.A. 64 through 65, as the result of pressure from the state-imposed monitors to put someone who would be representative of the minority communities in East Ramapo on the board. Mr. Grossman, the president of the board, has referred to her privately and dismissively as having zero control or influence and suggested that that's the only reason she remains on the board. And she was described by another member of the board as being an ideal candidate because she was, quote, not aggressive like another member of the board. So I think that, you know, Mrs. Charles-Pierre is a good example of, you know, the district is looking for what Congress has styled as safe minority candidates. There's also Ashley Lavelle, who's currently serving on the board. She was elected in 2019. The district court found that her election appears to have been engineered by the white-slating organization after counsel on the other side suggested that it would be good for the case to have two minorities running against one another. The district described those findings as conspiracy theory in its briefing. It still hasn't provided a substantive rebuttal of those findings. So I think overruling the district court's decision below with respect to the success of several minority candidates would give license to political actors to freely evade Section 2 through those kinds of tactics. That's exactly what Congress wanted to avoid. If I could, I'd like to turn this court's attention to the other probative facts regarding the role that race plays in East Ramapo School District. Whatever else the district court might say, it is clear from the district court's fact findings that race plays a huge role in the politics of East Ramapo. I'd like to run through a few of the findings that point that out. First, the district court found that white board members coordinated among themselves on important board business to the exclusion of minority board members. For example, in Essay 40, the district court found that white board members coordinated among themselves to the exclusion of minority board members, even to the exclusion of minority board members affiliated with the white slating organization. That they coordinated among themselves regarding the filling of a board vacancy and picking a white candidate over a black candidate. That white board members coordinated among themselves, even during the pendency of this case, regarding settlement negotiations. In this case, that's at Essay 65. The district court found that a white board member... How do you respond to the argument that the appearance of coordination is because of disagreements over policy and not because of race? Your Honor, I think that the example of the filling of this board vacancy, choosing Joe Heimovitz over a much more experienced black school principal who had extensive experience in the public school speaks to this. Because in that case, in that instance, the white board members weren't just coordinating among themselves to the exclusion of minority board members affiliated with the public school, the so-called public school faction. They were coordinating among themselves to the exclusion of black board members who'd been supported by the white slating organization. And I think that shows that race is doing a lot of work here. It's not just about policy. I would also point out that the district court focused a lot on the board's public meetings. Those meetings, the board adopted, was literally unresponsive to minority voters in the sense that it forbade board members, adopted a policy forbidding board members from responding to public school parents' comments at these public meetings. And the district court heard testimony from members of the community about the invidious racial dynamic of those meetings. One black witness who grew up in the South testified that those meetings reminded her, this is her quoting from her testimony, reminded her of the segregated South where you just don't have a say, and if you say something, you're treated badly. She said that members of the board treated members of the community like dirt. That's a trial transcript 821. District court also noted that the district's former superintendent made racially insensitive remarks about Latino students in the public schools. Those remarks contributed to distrust between the board and the community. The board took no action to remedy the situation until state monitors stepped in. That's at SA70. So in addition to our statistical evidence of racial polarization in this community, which we can talk about but is critical under the jingles preconditions, in addition to that statistical evidence, we have ample testimonial and anecdotal evidence of the ways that race plays an important role in the politics of East Ramapo. Your Honor, I would just, in summing up, I would note that the district court has lived with this case for a long time. It's presided over this case for nearly three years. It heard from nearly 30 witnesses at a 17-day trial on the merits earlier this year. It issued over 70 pages of fact-finding. Those findings are reviewed for clear error in this court, as well as the ultimate finding of vote dilution. There was no clear error, and if there are no further questions, I thank the court for its attention. Thank you, counsel. Mr. Levine, you have reserved two minutes for rebuttal. Thank you, Your Honor. I think it's important to refocus that this case is about elections, and Mr. Dameron doesn't have a lot to say about elections. He has a lot to say about the court's findings about internal board matters that don't actually matter to Section 2. In election after election, the undisputed data shows that majorities of white voters have supported black and Latino candidates on the private school slate, the same as white candidates, with no variation according to the race of the candidates. As the Fifth Circuit held in LULAC and as this court in Goosby agreed, that pattern unmistakably shows that minorities are not excluded on account of race. If the private school community candidates are winning elections by large margins, that's because their slate's policies are more popular with more voters. It's not because of race. We can control for the race variable by looking at the undisputed data. If public school community candidates lose elections, it isn't on account of race either. It is because there are fewer public school community voters. I also would just like to respond to the discussion about on account of race. The construction of the statute that the plaintiffs are urging on this court would bring this court into conflict with the First Circuit, the Fifth Circuit, the Seventh Circuit, the Ninth Circuit, the Eleventh Circuit. No court of appeal has ever accepted the argument that the plaintiffs are proposing. Every court of appeal has held that on account of race imports a causation requirement that requires race to be the cause of election results. And that flows from the plain language of the statute and from the history of the statute where Congress was re-adopting the standard from the Supreme Court's cases in Whitcomb versus Chavez and White versus Register. In both of those cases, the Supreme Court clearly was distinguishing between elections that were based upon built-in bias, which the court held was a violation, or elections that were just the result of regular politics or a mere euphemism for defeat at the polls. That distinction still holds today under Section 2. And the undisputed evidence was that minority-preferred candidates here, if they are losing, it is just a euphemism for defeat at the polls. It is not about race. Thank you, Your Honor. So thank you both for a well-argued case, a well-reserved decision. I am informed that...